UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| STEPHEN BRONDUM | * | Number 2:18-cv-04829 |
| | * | |
| v. | * | |
| | * | |
| CURTIS M. CAREY, BASSHAM | * | Judge Vance |
| WHOLESALE EGG COMPANY, INC., | * | |
| and THE TRAVELLERS INDEMNITY | * | |
| COMPANY | * | Magistrate Judge van Meerveld |
| | * | |
| ************************************ | * | ******************************** |

<u>Memorandum in Support of Motion to Exclude Testimony</u>

The defendants' expert, Torrence Welch, is an engineer who is not qualified to testify to medical causation, or to offer medical causation opinions at trial. Although we refer to him, as the defendants do, as "Dr." Welch, it is because he has a Ph.D. He is not a medical doctor and is not qualified to offer medical opinions.

This Court has previously prohibited Dr. Welch from testifying based on *Daubert* and FRE 702, as to specific medical causation opinions. *Thomas v. Chambers*, 18-4373 (USDC-EDLA) (April 17, 2019), 2019 U.S. Dist. LEXIS 65900. The same result should apply here. Further, as we will show, Dr. Welch offers a wide array of other inadmissible opinions and conclusions that should be barred at trial.

<u>Background</u>

The plaintiff's lawsuit concerns a March 23, 2017 accident and injury.

1

Dr. Welch's report offers- indeed, it begins with- the following stated conclusions:

1. The subject accident was a shallow sideswipe in nature, characterized by sliding contact between the left rear of the Freightliner tractor-trailer and the left rear of the parked Ford F-150.

2. During this sideswipe accident, both vehicles would have experienced minor rocking, shaking, and vibration motions, with no overall change in speed, angle, or position on the roadway.

3. There is no evidence to support that, following initial contact, the right-rear wheel of the Ford mounted the adjacent curb. Such motions of the Ford would not be expected based on the pattern of damage to the vehicles.

4. In response to the motion of the Ford, Mr. Brondum's body would have experienced very minor shaking and vibration motions, characterized by minimal flexion, extension, and lateral bending of the cervical spine, well within the normal range of motion.

5. Strain and/or sprain of the cervical, thoracic, or lumbar spine are not consistent with the dynamics of the subject accident for Mr. Brondum.

6. The mechanism for the traumatic herniation of a cervical or lumbar intervertebral disc was not present for Mr. Brondum during the subject accident.

7. The compressive loads experienced by Mr. Brondum's spine during the subject accident were less than those expected during typical activities of daily living.

8.  The subject accident provided no mechanical impetus for the structural exacerbation, aggravation, or progression of the pre-existing degenerative conditions present within Mr. Brondum's spine.

(Welch Report, p. 2.)

Dr. Welch's report then summarizes depositions taken in the case (pages 3-6). It follows up with review of photographs (pages 6-7).

Then, from pages 7 to 10, Dr. Welch's report summarizes medical reports, including the report of defendants' Rule 35 expert, Dr. Everett Robert.

At that point, the report turns to the section titled "Biomechanics Analysis" which engages in extensive speculation and discussions of specific medical causation. We will highlight the most prominent examples.

In the first such example, Welch takes as a given the nature of the impact, presenting it as one "determined to be" an accident at particular speeds. No scientific basis for this determination is offered. On the basis of this unfounded assumption, Welch then assumes the "range of spinal motion" involved during the accident, an assumption he has not documented with any scientific accuracy. He then opines that strains and sprains are "highly unlikely," a specific medical causation opinion:

The subject accident ***was determined to be*** a shallow sideswipe contact with no change in speed for the involved vehicles. During the sideswipe, Mr. Brondum's Ford would have been subjected to vibration and lateral shaking motions, with no changes in the vehicles

3

position or angle on the roadway. This vehicle motion would have resulted in further
reduced swaying motions to Mr. Brondum's body, including minor lateral bending of his
cervical and lumbar spine ***well within the normal range of spinal motion***. ***No significant
compressive or tensile forces would have been applied*** to Mr. Brondum's spine during
this event. Under these conditions, strains and sprains of the cervical, thoracic, and
lumbar spine are ***highly unlikely***.

(Welch Report, pp. 10-11) (Emphases added.)

The report continues, by referencing in vague fashion that certain "studies" at particular
speeds may or may not have resulted in injuries. From this, he again restates his assumptions
about the severity of this particular impact; his assumptions about the loads the plaintiff was
specifically subject to; and again offers a specific medical opinion, namely that "[p]ermanent
injuries to Mr. Brondum are highly unlikely." Again, he points to no scientific basis for this:

Studies in which passenger vehicles have been exposed to sideswipes have shown that
the vibrations, motions, and loads experienced in these accidents are well within the
magnitude of the motions, accelerations, and loads experienced during daily activities. In
fact, these studies indicate that the peak accelerations during such sideswipe impacts
were less than 1.5g – only marginally more than gravitational acceleration – even for
those sideswipes involving heavy commercial vehicles and resulting in far more
extensive deformation and component engagement than was present in the subject
accident. The accident involving Mr. Brondum ***was far less severe*** than those performed

4

in these studies. Therefore, the motions of the vehicles and the loads to which Mr.

Brondum would have been exposed *would have been less severe.* Further, the forces and

accelerations experienced during the subject accident were low in magnitude and within a

range that can be withstood with minimal muscular effort. The loads experienced by

occupants during sideswipe accidents similar to the subject accident are multiple times

less than those associated with human injury, as established through peer-reviewed

experimental research involving live volunteers, cadavers, and crash test dummies. The

loads experienced by the cervical spine during such sideswipes are within the range of

those experienced during activities of daily living known to be benign, such as sneezing,

plopping into a chair, or hopping from a step. Similarly, the loads experienced by the

lumbar spine are well below those experienced during activities of daily living, such as

walking, running, or bending over. *Permanent injuries to Mr. Brondum are highly*

*unlikely.*

(Welch Report, p. 11) (Emphases added.)

Next, he offers speculation on the specific accelerations upon curb impact in this

accident, despite admitting a lack of physical evidence for it. From there, he references studies

that allegedly show the bodily impact upon others in allegedly similar accidents. Nothing is

offered to tie any of this speculation in a concrete, much less scientific, manner to Mr.

Brondum's accident. Yet he again recites the ever-ready conclusion, that Mr. Brondum "would

have received minimal accelerations, and permanent injuries would have been highly unlikely."
He thus repeats his opinion on specific medical causation:

> Although there was no physical evidence of curb impact for the Ford following the
> subject sideswipe accident, such curb impacts present very minimal accelerations levels
> to a vehicle. For curb impact speeds below 4 mph, when the wheels of the vehicle do not
> mount the curb, the occupant's body tends to move slightly forward in the occupant
> compartment with accelerations of approximately 3 to 4g. In this scenario, occupants do
> not strike any interior components of the vehicle in response to the curb impact, and often
> describe the impact as being less than or similar to what they experience while riding
> bumper cars. Research studies of curb impacts also indicate that, as the speed of curb
> impact increases, the vehicle begins to mount the curb and the peak accelerations
> experienced by occupants within the vehicle decreases, with vertical (rather than forward)
> accelerations to the occupant of approximately 1g. Additionally, these studies indicated
> that, if the curb is sloped (or mountable), curb impacts at speeds up to 27 mph result in
> accelerations less than 1g, with only slight jiggling of the occupant's body and no
> engagement of the seatbelt locking mechanism. Taken together, this indicates that, during
> any such curb impact for the Ford during the subject accident sequence, Mr. Brondum's
> body *would have received minimal accelerations, and permanent injuries would have*
> *been highly unlikely.*

(Welch Report, pp. 11-12) (Emphases added.)

6

From there, Dr. Welch, who is not a medical doctor, discusses his own understanding of the likely causes of disc injuries. He opines, without any scientific foundation, that the necessary mechanism for injury was not present in this specific accident.

Disc bulges and herniations, in the absence of trauma to other associated structures (e.g., vertebral body fractures, facet damage, or ligamentous damage), ***rarely result from single, acute events.*** The viscoelastic properties of the intervertebral disc result in a rate-sensitive force response of the tissue, in which the tissue becomes stiffer (or stronger) when loaded quickly. For this reason, compressive loads create fractures in the vertebral endplates; torsional and shear loads yield fractures of the facets; and tensile loads and hyperflexion/hyperextension of the spine result in the tearing of the spinal ligaments – all at levels lower than that required to damage the disc. Only in combined loading, during which the spine is in hyperflexion and subjected to a sudden compressive load, have traumatic disc prolapses from a single event been produced in the absence of injuries to other elements of the spine. ***This necessary mechanism for traumatic disc herniation was not present during the subject accident.*** Additionally, research studies of isolated human spinal specimens have demonstrated that this combined loading scenario for traumatic disc prolapse requires, ***on average,*** approximately 1,200 pounds of compressive load to be applied along the axis of the spine. When compared to the compressive loading associated with traumatic disc herniation, ***the subject accident presented spinal loads approximately seven times less than the required compressive***

7

> ***spinal loads for acute disc damage.*** Additionally, experimental research studies
>
> involving whole human spines have demonstrated that the live human spine is capable of
>
> withstanding forces two to three times greater than those indicated by research involving
>
> isolated human spinal specimens.

(Welch Report, pp. 12-13) (Emphases added.)

Dr. Welch, a non-physician, once again offers his understanding of the medical causes "most often" resulting in disc injuries:

> Instead, disc bulges and herniations ***most often develop*** as a result of repetitive loading
>
> over many years as part of the natural aging process, and often are not associated with
>
> any symptoms or pain. Studies indicate that 71 percent of cervical discs from patients
>
> over the age of 40 with no reported neck pain symptoms showed signs of degeneration in
>
> the form of major abnormalities, with 53 percent having at least one narrowed disc space
>
> or degenerated disc and 18 percent showing spondylosis or foraminal stenosis. Similarly,
>
> studies indicate that 79 percent of lumbar discs from patients with no reported back pain
>
> symptoms showed signs of degeneration, with 36 percent having at least one herniated
>
> disc and 21 percent having stenosis of the vertebral foramen. Disc degeneration was also
>
> shown to increase with age, whereby 86 percent of male cervical discs and 89 percent of
>
> female cervical discs showed signs of degeneration for those patients over age 60. For
>
> men, in particular, all lumbar discs showing signs of degeneration by age 50.

8

(Welch Report, p. 13) (Emphases added.) Notably, he cites no evidence to support these medical opinions.

From that foundation, however, he then proceeds to offer his own medical interpretation of Mr. Brondum's MRI images:

> This is **consistent with the radiological films** taken of Mr. Brondum's cervical and lumbar spine (age 50 at the time of the subject accident), which **showed signs of degenerative changes that develop over the course of many months and years** in response to changes in disc mechanics associated with disc degeneration. As the disc degenerates, bulges and protrusions can lead to the narrowing of the spaces occupied by the spinal cord and exiting nerve roots, resulting in the crowding and deformation of these sensitive tissues. Additionally, changes in the force distribution throughout the spine in response to altered disc mechanics initiates an active bone response that can accumulate and act to narrow the central canal or neural foramen. **Among all asymptomatic patients studied, the C5/6 level had the greatest prevalence of abnormalities.** Interestingly, similar to the asymptomatic patients in the aforementioned studies, the greatest degree of degenerative changes to Mr. Brondum's cervical spine was identified at C5/6.

(Welch Report, p. 13) (Emphases added.) So Dr. Welch claims that the specific radiological images of Mr. Brondum are "consistent with" his own medical theories. He offers the medical opinion that his interpretation of the images "showed signs of degenerative changes that develop

9

over the course of many months and years"- rather than, of course, specific medical causation

from this accident. He then attempts to tie the C5 / C6 radiological finding, to his summary of

other "studies" showing such findings in others in the population.

From there, Dr. Welch proceeds to offer more medical opinions. As he describes

"biomechanical research," it allegedly can prove whether a particular disc may be prone to

injury:

> Biomechanical research *has also shown that a previously degenerated disc is not*
>
> *necessarily more prone to traumatic injury than a healthy disc*. Degenerated discs may
>
> be stable and become more difficult to herniate than healthy discs, as the degeneration
>
> process is associated with the thinning and calcification of the disc and the desiccation of
>
> the paste-like inner material of the disc (nucleus pulposus).

(Welch Report, p. 14) (Emphases added.) There is no scientific foundation offered for this claim

as to what the "research" of engineers "has shown" about the propensity for injury of the human

body.

Yet based on these medical assertions, Dr. Welch returns to offering medical opinions:

The subject accident *presented loads to Mr. Brondum's spine that were less than those*

*he likely experienced during the events of the day* leading up to and after the accident,

including walking to and from the vehicle. Additionally, the subject accident *presented*

*loads to Mr. Brondum's spine that were several times less than those associated with*

*the initiation of microtrauma to the disc*, which, on average, requires approximately 750

10

pounds of compressive load for previously degenerated discs. ***No progression or***

***structural aggravation to the degenerative condition of Mr. Brondum's spine is likely***

***to have occurred*** as a result of the subject accident.

(Welch Report, p. 14) (Emphases added.) Again, Dr. Welch does not show any scientific basis

for how he knows the loads experienced by Mr. Brondum during this incident, thus any

comparison to alleged average experiences by others are not relevant. And once again, he offers

a medical opinion- stating that no "progression or structural aggravation" to what he describes as

the "degenerative condition" of Mr. Brondum's spine, is "likely to have occurred" as a result of

the accident.

Dr. Welch then repeats what he has said multiple times in the past. He once again

describes the accident in terms favorable to the defense. Then, he offers specific opinions on

whether the supposed forces involved could have caused Mr. Brondum's particular injury:

In summary, during the subject accident, the left rear of the Freightliner tractor-trailer

made sliding contact with the left rear of the parked Ford F-150.  The ***dynamics of the***

***subject accident were not consistent with sprain and/or strain injuries*** to Mr.

Brondum's spine.  Further, the mechanism for the traumatic herniation or exacerbation of

a preexisting intervertebral disc herniation in the cervical or lumbar spine ***was not***

***presented to Mr. Brondum's body during this sliding vehicle contact***.

11

(Welch Report, p. 14) (Emphases added.) As on all prior occasions, he offers no scientific basis for this opinion, and no demonstration of why he is qualified to offer opinions on whether Mr. Brondum did or could have suffered an injury.

The report then, in conclusory terms, recites that its "methods used and studies cited" are "relevant to the biomechanics of human motion and injury mechanisms resulting from accidental events." No explanation is offered for this statement. It describes biomechanics as "the application of principles and methods of engineering mechanics to the study and solution of problems arising in biology and medicine." Nothing is offered to show how he is qualified to offer medical opinions. He then attempts to tie his alleged expertise to medicine, again asserting in conclusory fashion that biomechanics is "widely accepted within the scientific community and forms the basis of orthopedic and chiropractic medicine." (Welch Report, p. 14.)

The report concludes by asserting, without showing how, that Dr. Welch is able to use these "principles" to explain the motions of Mr. Brondum as well as whether the loads and accelarations he experienced could cause injury:

In this particular case, the application of biomechanics principles explains the motions of Mr. Brondum within the vehicle upon impact, the nature of the loads and accelerations experienced by the tissue, **and the mechanisms and potential for those loads and accelerations to result in damage or failure to tissue resulting in injury.** These methods have been tested and have yielded consistent results in the articles cited in the Basis of Report and others. The methods used in these reports can be verified experimentally by

using the same methodologies.  All opinions expressed in this report were done so to a

reasonable degree of engineering and biomechanical probability.

(Welch Report, pp. 14-15) (emphases added.) There is no description of any alleged "testing"

referred to in this portion of his report. It states that its opinions are "to a reasonable degree of

engineering and biomechanical probability" but there is no explanation of what such a

"reasonable degree" consists of.

This report repeatedly offers medical opinions on the possibility and degree of injury to

Mr. Brondum. This is not permissible, and outside the scope of what this witness may testify to.

## Discussion

### A. Expert Testimony and Rule 702

In federal court, FRE 702 governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or
education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of
fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The threshold inquiry is whether the expert possesses the requisite qualifications to

render an opinion on a particular subject matter. *Wagoner v. Exxon Mobil Corp*., 813 F. Supp. 2d

771, 799 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A

district court should refuse to allow an expert to testify if it finds that a witness is not qualified to testify in a particular field or a given subject."). If the expert's qualifications are found to be sufficient, the court then must examine whether the expert's opinions are reliable and relevant. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Under *Daubert*, district courts, as "gatekeepers," are tasked with making a preliminary assessment of whether the expert's testimony is relevant and reliable. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002). The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002). The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004).

Defendants, as the proponents of Dr. Welch's testimony, have the burden of proving by a preponderance of the evidence that he possesses the requisite qualifications to render opinions on the subject matter of this action and that his opinions are reliable, relevant, and admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). "With respect to qualifications, the proponent must demonstrate that the expert possesses a higher degree of

knowledge, skill, experience, training, or education than an ordinary person." *Louviere v. Black & Decker U.S., Inc*., No. 1:00CV597, 2001 WL 36385828, at *1 (W.D. Tex. Oct. 26, 2001).

To meet its burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5th Cir.1998).

When examined in light of these important gatekeeping standards, this Court should exclude Dr. Welch from testifying or rendering any opinion as to whether the accident caused or contributed in any way to Plaintiff's injuries.  Not only is Dr. Welch unqualified to testify as Plaintiff's medical condition and/or any related medical-causation analysis but his opinions with respect to medical causation are the product of unreliable principles and methods.

Further, in the field of biomechanics, Dr. Welch actually does not offer any explanation for the methodology he employed to determine the alleged "forces" he calculates were at work on Mr. Brondum's body at the time of the accident.

**B. This Court Should Exclude Dr. Welch from Testifying or Rendering an Opinion as to Whether the Accident Caused, or Could Have Caused, Plaintiff's Medical Injuries.**

Dr. Welch's report repeatedly offers medical causation opinions. After arriving at unknown methods at his determination of the "forces" acting on Mr. Brondum's body, he repeatedly asserts that Mr. Brondum was not, or could not have been, or was very unlikely to have been, injured in the accident.

15

Courts within this district and beyond routinely exclude biomechanical experts – even those with a medical background – from testifying as to whether an accident or any force of impact could have caused a plaintiff's medical injuries.  For example, in *Oaks v. Westfield Insurance Co.*, the Eastern District of Louisiana excluded Richard Harding, a purported biomechanical expert, No. 13-1637, 2014 WL 198161 (E.D. La. Jan. 16, 2014) (Judge Barbier), who attempted to offer the exact type of testimony Dr. Welch seeks to do in this case.  In *Oaks*, Mr. Harding intended to testify with respect to both "biomechanics and medical causation by opining that the force of impact could not have caused Plaintiff's injuries."  *Id.* at *2. The district court excluded Dr. Harding, in part, on the basis that he was not qualified to testify with respect to issues of medical causation:

> Dr. Harding is not qualified to testify about Plaintiff's medical condition because he is not board certified or certified in any medical specialty, he has not practiced clinical medicine in over a decade, and he has never been licensed to practice medicine in the United States. Although he was at one time licensed to practice medicine in the United Kingdom, he has since lost his license due to inactivity.

*Id.* at *2.  Dr. Welch has even less claim to testify on these matters. He has never been a medical doctor in this or any other country. See also *Parker v. NGM Insurance*, No. 15-2123, at *9-10, 2016 WL 3546325 (E.D. La. 6/23/16) (Judge Morgan), excluding another biomechanical expert who attempted to offer opinions on the forces at work in the plaintiff's body, and whether he was injured in the accident. Other courts hold to the same effect. *See, e.g.*, *Rodriguez v. Athenium House Corp*, No.11-CIV-5534, 2013 WL 796321, at *4 (S.D.N.Y. March 5, 2013)

("biomechanical engineers are not qualified to testify 'as to whether [an] accident caused or contributed to any of plaintiff's injuries' as this would amount to a medical opinion"); *Morgan v. Girgis*, No. 07-CIV-1960, 2008 WL 2115250, at p. *6 (S.D.N.Y. May 16, 2008) (holding that biomechanical experts are not qualified to testify "as to whether [an] accident caused or contributed to any of plaintiff's injuries," as that would amount to a medical opinion"); *Shires v. King*, No. 2:05-CV-2006, 2006 WL 5171770 at *3 (E.D. Tenn. Aug. 10, 2006) (holding that a biomechanical expert cannot offer opinions 'regarding the precise cause' of plaintiff's injury).

Dr. Welch is not qualified to offer opinions regarding the cause of Mr. Brondum's injury. He should be barred from testifying to such matters, and also to the many related variations on this theme he attempts, such as whether injury to Mr. Brondum would be "likely" and whether specific forces were at work in Mr. Brondum's body, and what effect they would likely have had on his tissues and discs.

At this point we return to this Court's opinion excluding in part and limiting Dr. Welch's testimony in *Thomas v. Chambers*. In that case, the Court held that since an expert "need only possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of his testimony, the Court finds that Dr. Welch is qualified to serve as an expert in biomechanical engineering and accident reconstruction."

But in this case, he should be limited to offering opinions in biomechanical engineering only. His report is titled simply "biomechanical evaluation" (Cover Page of the Welch Report). Although the Introduction section of the report states "Rimkus Consulting Group, Inc. was

retained to reconstruct the accident scenario and to determine the motions and loads that Mr.

Brondum would have experienced in relation to his claimed injuries", no further discussion of

any "reconstruction" of the accident is discussed. There is no specific portion of the report

concerned with "reconstruction," although as we have mentioned, many parts of it do attempt to

discuss the forces at work on Mr. Brondum's body.

So to the extent he may testify at all, he should only be allowed to do so as a

biomechanical expert.

However one characterizes the field in which he is proffered in this case, however, we all

agree he is not a medical expert. He cannot testify to medical causation. The Court summarized

the law in this area just last month when dealing with his testimony:

> Federal courts have found that biomechanical engineering experts like Dr. Welch are qualified to offer opinions on "what injury causation forces are in general" and "how a hypothetical person's body will respond to those forces," but are "not qualified to render medical opinions regarding the precise cause of a specific injury." *Laski v. Bellwood*, 215 F.3d 1326, 2000 WL 712502, at *3 (6th Cir. May 25, 2000); *see also Collett v. GEICO Cas. Co.,* No. 16-15908, 2017 WL 4553525, at *1 (E.D. La. Oct. 11, 2017). Dr. Welch is not certified in any medical specialty. Nor does he hold a medical degree. He therefore cannot offer an opinion on whether the estimated forces plaintiffs experienced during the collision in fact caused their injuries. He may testify only to "the amount of force he believes was generated by the accident and the observed effect of such force on a hypothetical human body in a comparable accident." *Collett,* 2017 WL 4553525, at *1. For instance, Dr. Welch cannot opine at trial—as he does in his report— that the "[t]he dynamics of the subject vehicle interaction were insufficient to result in sprain/strain injuries *for Ms. Thomas, Mr. Clark, and Ms. Harris.*"[26] Nor can he testify that the accident "provided no impetus for the structural exacerbation, aggravation, or progression of the pre-existing degenerative or congenital conditions present with the spines of [each plaintiff]."[27] These are the types of specific medical causation opinions that are outside of his expertise.

18

*Thomas v. Chambers, supra* (internal footnotes omitted).

As previously recognized, Dr. Welch is not qualified to testify to medical causation, and should be prohibited from doing so.

**C. This Court Should Bar Dr. Welch From Offering Opinions On The Forces Involved In the Collision, Or The Forces Acting on Mr. Brondum's Body**

Under FRE 702, the proponent of expert testimony must show:

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

But the conclusions offered in the "Conclusions" section of Dr. Welch's report (page 2) are just that: bare conclusions. The many pages that follow do not explain with anything more than vague references to science and expertise, how he arrived at them.

For example, his first "conclusion" as to the nature of the accident, is apparently based on nothing more scientific than his own review of the depositions and other background information such as vehicle photos. It does not take an "expert" to do that. A jury does not need the help of an "expert" to understand what happened in this auto accident.

But it is followed by his second conclusion, on the kinds of movements that would be involved in the accident. Nothing in this second conclusion requires any expertise. His third conclusion is not explained in the body of his report, other than by mere reference to his status as

an expert. Yet he uses that to support his remaining conclusions, all of which relate to medical causation.

Under FRE 702(b), the defendants have to prove Dr. Welch's testimony is based on *sufficient facts or data*. No explanation of any scientific or technical nature is offered in this report to support his "conclusions" regarding the accident. Indeed, the facts he points to, are all just the kind of organic facts (witness testimony, photographs) that triers of fact use every day to resolve disputed claims, without need for an "expert" to interpret them.

To the extent he intends to offer testimony about what forces acted on Mr. Brondum's body, he never actually specifies what the forces were, or quantifies them. The closest he comes is on page 11 of his report, but even there he attempts no calculation of the actual forces involved in this accident. He is just speculating.

Under Rule 702(c), the defendants must prove Dr. Welch's testimony "is the product of reliable principles and methods." Regardless of whether biomechanics is accepted, in general, as a discipline or field of study, for the reasons we have explained, even an expert cannot just guess and speculate about the forces involved in an incident, in order to offer opinions that they were not severe.

Under Rule 702(d), defendants must prove Dr. Welch "has reliably applied the principles and methods to the facts of the case." Dr. Welch does not explain the principles and methods he used. He simply provides a long narrative report, and a list of literature references at the end. What is missing is any attempt to show how any of those authorities, or principles of his field,

can produce any kind of calculation or quantification of the forces he claims to have been involved and acting on Mr. Brondum. The most likely explanation for why he did not attempt this is because he simply had no information that would have informed such an opinion, so he is reduced to speculating. This is not sufficient to allow admissibility of his testimony.

In this context, we return to the final sentence of his report- "All opinions expressed in this report were done so to a reasonable degree of engineering and biomechanical probability."

What degree? What probability? Nothing is offered. No estimation of probability, no margin of error is offered, no quantification of any kind. In the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation. *Daubert, supra*. This is because his discussion of forces is simply speculation. He has no way to quantify any uncertainties or rates of error in his discussion of Mr. Brondum for that reason. Thus his testimony should be excluded.

### Conclusion

This Court should prevent Dr. Welch from testifying to medical causation or offering any medical opinions, as it did in *Thomas v. Chambers*. The causation opinions he offers are outside his expertise.

Further, the Court should prevent Dr. Welch from testifying as to the alleged forces he suggests were at work in the accident, and what forces were acting on Mr. Brondum's body. It is apparent this portion of his report is just based on speculation. Recall that defendants have the

21

burden of proving this testimony is admissible. And to meet its burden, a party cannot simply

rely on its expert's assurances that he has utilized generally accepted scientific methodology.

Rather, some objective, independent validation of the expert's methodology is required. *Moore v.*

*Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir.1998). Whatever his qualifications in

general- and we do not doubt that he is knowledgeable about the field of biomechanics- he

cannot simply assure us that he relied on scientific principles, and must offer "some objective,

independent validation of the expert's methodology" for his testimony to be admissible. Nothing

in this report does so, and therefore his testimony is not admissible.

Respectfully submitted:


*/s/Brian King*
Brian King, La. Bar #24817
Jason F. Giles, La. Bar #29211
Anthony J. Milazzo, III, La. Bar #29631
The King Firm, LLC
2912 Canal Street
New Orleans, LA 70119
Phone 504-909-5464
Fax 800-901-6470
E-mail: bking@kinginjuryfirm.com

22

## CERTIFICATE OF SERVICE

I certify that on May 20, 2019, I filed this pleading via this Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/Brian King*
**BRIAN KING**

23